**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

JOHN T. MORROW,                              :

     Plaintiff,                              :

vs.                                          :          CA 16-0224-C

NANCY A. BERRYHILL,                          :
Acting Commissioner of Social Security,[1]
                                             :
     Defendant.


**<u>MEMORANDUM OPINION AND ORDER</u>**

     Plaintiff brings this action, pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security denying his claims for a period of disability and disability insurance benefits. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 14 & 15 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.").) Upon consideration of the administrative record, plaintiff's brief, the Commissioner's brief, and the arguments of counsel at the February 16, 2017 hearing before the Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[2]

---

[1]    Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Berryhill is substituted for Carolyn W. Colvin as the proper defendant in this case.

[2]    Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 14 & 15 ("An appeal from a (Continued)

Plaintiff alleges disability due to post-traumatic stress disorder (PTSD), anxiety disorder, depressive disorder, chronic obstructive pulmonary disease (COPD), status-post right knee repair, and gastro esophageal reflux disease (GERD). The Administrative Law Judge (ALJ) made the following relevant findings:

> **1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.**
>
> **2.     The claimant has not engaged in substantial gainful activity since May 10, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).**
>
> **3.     The claimant has the following severe impairments: post-traumatic stress disorder (PTSD), anxiety disorder, depressive disorder, chronic obstructive pulmonary disorder (COPD), status post right knee repair, and gastro esophageal reflux disease (GERD) (20 CFR 404.1520(c)).**
>
> .     .     .
>
> **4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**
>
> .     .     .
>
> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of one every 4 months, each lasting for at least 2 weeks.

------

judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

In activities of daily living, the claimant has moderate restriction. The claimant watches television, reads, vacuums, and has no issues with performing personal care. The claimant is able to drive a car as well. Nevertheless, he has nightmares at night and/or he wakes up at night and feels restless. Thus, the claimant has a moderate restriction in regards to activities of daily living.

In social functioning, the claimant has moderate difficulties. The claimant is able to go out of the house daily. He goes to his parent[]s['] house and does to doctor[]s['] appointments. He is able to get along with authority figures. Nevertheless, going out in public makes him nervous. Thus, the claimant has moderate difficulties in regards to social functioning.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant is able to count change and follow instructions. The claimant is able to shop for movies and books by computer for an hour at a time. Nevertheless, he needs reminders to take his medication and does not handle stress well. He wakes up at night and feels anxious. Thus, the claimant has moderate difficulties in regards to concentration, persistence or pace.

As for episodes of decompensation, the claimant has experienced one to two episodes of decompensation, each of extended duration. The claimant had one overnight admittance and one three day admittance, both in 2011. Nevertheless, the claimant has a limited need for hospitalizations and has not been hospitalized recently.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The findings [and] opinion of Linda Duke, Ph.D. is given great weight because it is generally consistent with the claimant's alleged complaints, symptoms, examination findings, overall treatment record, and the claimant's activities of daily living.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. In regards to 12.04, the claimant has not had a medically documented history of a chronic mental disorder, psychotic disorder, or chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, with repeated episodes of decompensation, expected decompensation with minimal increase in mental demands or change of environment, or a current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an

indication of continued need for such an arrangement. In regards to 12.06, the claimant does not suffer an anxiety related disorder that results in complete inability to function independently outside the area of his home.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5.       After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except the claimant cannot have contact with the public, but can have occasional contact with supervisors and co-workers. The claimant can have occasional changes in the work setting or routine. The claimant cannot work around or at unprotected heights, and cannot operate automotive equipment. The claimant cannot climb ladders, ropes, or scaffolds. The claimant can occasionally push and/or pull with leg controls on the right and can occasionally stoop, kneel, crouch, crawl, balance, and climb ramps and steps. The claimant cannot have concentrated exposure of 5 minutes or more to fumes, odors, gases, temperature extremes, including the heat of a blowtorch or cold of a freezer. The claimant requires a well-ventilated work environment. The claimant can perform goal-oriented work but not production-paced work, and can maintain attention and concentration for up to 2 hours at a time. The claimant is able to understand [and] carry out detailed but uninvolved written or oral instructions involving a few concrete variables in or from standardized situations.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

.       .       .

In terms of the claimant's alleged physical impairments, COPD, status post right knee repair, and GERD, the claimant's symptoms are generally controllable with medication and/or the symptoms are not persistent.

Moreover, at the hearing, the claimant testified that his knee pain has improved with surgery. . . .

The claimant's treatment records from the Veteran's Affairs (VA) Gulf Coast Veteran's Health show that the claimant was assessed with COPD, GERD, and pain in his lower leg, particularly knee arthralgia, but generally overall, did not complain of pain. The claimant made complaints of painful respiration and dyspnea. Nevertheless, the claimant had objective pulmonary function studies showing only mild obstruction with no restriction and with a normal diffusion capacity. In November 2012, upon examination, the claimant had a normal gait and posture. He was able to toe walk, heel walk, and heel to toe walk. He had full strength in all of his extremities as well. He was assessed with obesity and GERD. In April 2013, the claimant presented for a severe cough. His lungs were normal with a few rhonchi moving air easily. His extremities were examined [and] there were generally normal findings. It was noted that his GERD had improved with medication as well.

Treatment records from April 2013 noted that the claimant's COPD and GERD symptoms had all improved. A chest X-ray from July 2013 showed normal findings. Treatment noted from September 2013 show that the claimant reported having zero pain. Treatment records from May 2014 show that the claimant's COPD was well controlled with medication. Moreover, the overall physical findings were within normal limits at this time. The claimant was able to change and control body position with limitation.

In terms of the claimant's alleged mental impairments, PTSD, anxiety disorder, depressive disorder, the claimant has not received aggressive treatment despite two instances of hospitalizations for a short time in 2011. The claimant's treatment records from the VA Gulf Coast Veteran's Health show that the claimant was assessed with PTSD, panic disorder, and depression. [O]n August 22, 2011, the claimant was admitted for an anxiety attack, but discharged, with a total admittance time of approximately three days. Upon examination in August 2011, he was alert, cooperative, able to perform multiplication problems, demonstrated [g]ood judgment and problem solving skills, and had no cognitive deficits noted. The claimant reported difficulty going out in public. Upon discharge, his mood was fair, and he was calm and stable. He was assessed with panic disorder and a history of PTSD.

Earnest Hudson, D.O. assessed the claimant with PTSD and a global assessment of functioning (GAF) score of 60, which indicates only moderate symptoms. Chad Hagans, Psychologist, examined the claimant in January 2012 and found that the claimant had a GAP score of 55, which indicates moderate symptoms. Upon examination, the claimant's speech was normal, and his mood was mildly to moderately dysphoric with a generally restricted affect, but no observable impairments in attention, concentration or memory.

5

As of July 2013, Linda Lindman, Ph.D. examined the claimant and noted that he had anxiety and near-continuous panic or depression affecting his ability to function with impairment in social and occupational areas of functioning.

Treatment notes from November 2013 show that the claimant's mood was "okay" despite a constricted affect. His speech was normal, and his insight and judgment were assessed to be good. Time spent doing supportive psychotherapy was noted to be zero. He was assessed with PTSD and prescribed medication. Additional treatment notes indicate that the claimant was given a 70% service connected rating for PTSD.

After considering the evidence as a whole, the undersigned finds that the above residual functional capacity accommodates the claimant's severe impairments and symptomology. The claimant's mental impairments are accommodated by the social, stress, and concentration limitations, particularly having no contact with the public, no performing production paced work, and concentration for up to 2 hours. The claimant's physical impairment of COPD is accommodated by the limitation that the claimant cannot have exposure of 5 minutes or more to fumes, odors, gases, temperature extremes, including the heat of a blowtorch or cold of a freezer, as well as having a well-ventilated environment. The claimant's physical impairments of GERD and status post right knee repair, as well as his COPD and any alleged pain or dyspnea complaints, are accommodated by the preclusion of working around or at unprotected heights, operating automotive equipment, or climbing ladders, ropes, or scaffolds. The limitation to occasional pushing and/or pulling with leg controls on the right accommodates the claimant's status post right knee repair. Moreover, the claimant's GERD is accommodated by the limitation to medium work and preclusion from performing heavy work.

.        .        .

The opinion of Chad Hagans, Psychologist, is given generally great weight in that it is consistent with the claimant's complaints, particularly in light of his fear of going out in public, the claimant's overall treatment records, and findings upon examination.

The opinion of Dr. Lindman is given great weight in that while her opinion is partially one reserved to the Commissioner, it is generally consistent with the claimant's alleged symptoms, her examination findings, and with the VA 70% disability rating, and the GAF score of 55, which significantly limits the claimant's interaction with others and in handling work pressure. Thus, her opinion is given great weight.

The opinion of Dr. Hudson is given little weight because it is not consistent with examination findings wherein the claimant's concentration and memory were not impaired, the claimant's abilities to perform simple

math and problem solving tests, the claimant's GAF scores of 55 and 60 rather than one indicating serious symptoms, limited need for inpatient hospitalization, and the lack of consistent, formal, and aggressive mental health treatment, such as on-going counseling. Moreover, the undersigned notes that Dr. Hudson is not a mental health specialist. Thus, his opinion is given little weight.

The opinion of Linda Duke, Ph.D. is given great weight because it is generally consistent with the claimant's alleged complaints, symptoms, examination findings, overall treatment record, and the claimant's activities of daily living. Moreover, it particularly adequately accommodates and contemplates the claimant's social limitations in light of his issues with being in public and anxiety symptoms.

In regards to the VA rating of 70% in regards to his PTSD, the undersigned has [] fully considered the VA's opinion pursuant to SSR 06-3p. A decision by any nongovernmental agency or any other governmental agency about whether an individual is disabled is based on its rules and is not the Social Security Administration's decision about whether a person is disabled. Nevertheless, the impairment of PTSD set forth by the VA in its decision has been deemed "severe" under Social Security regulations by the undersigned. Insofar as the VA's rating is consistent with the findings and conclusions, it is given great weight. Specifically, the undersigned has contemplated this opinion evidence in the above residual functional capacity and the social interaction limitations and the preclusion of production-paced work.

.     .     .

The claimant's alleged disability is not credible because the claimant has not received aggressive or consistent treatment for his physical impairments, and they are generally controlled with medication. Specifically, the claimant's treatment records show where the claimant reported that his COPD and GERD symptoms were controlled and doing well, particularly with proper medication. Examination findings show that the claimant generally had a normal gait and posture, as well as full strength. Moreover, the claimant reported numerous times that he had no pain as well. A chest X-ray from August 2011 show[s] generally normal findings and a pulmonary function test showed only mild obstruction. In regards to his mental impairment, while the claimant has issues being around other people, he is able to go to doctor[]s['] appointments and visit with his parents. Moreover, the claimant has not received aggressive treatment for his mental health symptoms, such as consistent on-going group or individual counseling. Instead, the claimant typically reports on-going symptomology, and then is prescribed medication with agreed plans made with the medical provider. His allegations as to being disabled physically and mentally are belied by his activities of daily living, namely his ability to perform household chores, spend time with his parents, read books, watch movies, relax on his deck, drive a car, go

shopping via a computer, and has no problems with personal care. He has not required frequent inpatient hospitalizations and only limited hospitalizations for his mental impairments, and has not required recurrent emergency room visits for his physical impairments.

.        .        .

**6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).**

.        .        .

**7.      The claimant was born on August 17, 1970 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).**

**8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).**

**9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).**

.        .        .

If the claimant had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by Medical-Vocational Rule 203.29. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled medium occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as: hand packager (DOT 920.587-018) which is medium unskilled work with approximately 798,000 jobs in the national economy; laundry worker I (DOT 361.168-014) which is medium unskilled work with approximately 197,000 jobs in the national economy; and food preparer (DOT 311.674-014) which is light unskilled work with approximately 785,000 jobs in the national economy.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11.     The claimant has not been under a disability, as defined in the Social Security Act, from May 10, 2010, through the date of this decision (20 CFR 404.1520(g)).**

(Tr. 22, 23, 23-25, 26-27, 27-28, 28-29, 29, 30 & 30-31 (internal citations omitted; emphasis in original).)  The Appeals Council affirmed the ALJ's decision (Tr. 1-3) and thus, the hearing decision became the final decision of the Commissioner of Social Security.

## DISCUSSION

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation

to determine whether the claimant is disabled, which considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairments in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Commissioner of Social Sec.*, 457 Fed. Appx. 868, 870 (11th Cir. Feb. 9, 2012)[3]

(per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart*, 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden, at the fourth step, of proving that he is unable to perform his previous work. *Jones v. Bowen*, 810 F.2d 1001 (11th Cir. 1986). In evaluating whether the claimant has

---

[3]     "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

met this burden, the examiner must consider the following four factors:  (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.  *Id.* at 1005. Although "a claimant bears the burden of demonstrating an inability to return to his past relevant work, the [Commissioner of Social Security] has an obligation to develop a full and fair record." *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted). If a plaintiff proves that he cannot perform his past relevant work, as here, it then becomes the Commissioner's burden—at the fifth step—to prove that the plaintiff is capable—given his age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national economy. *Phillips, supra,* 357 F.3d at 1237; *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *cert. denied,* 529 U.S. 1089, 120 S.Ct. 1723, 146 L.Ed.2d 644 (2000); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985).

The task for the Magistrate Judge is to determine whether the Commissioner's decision to deny claimant benefits, on the basis that he can perform those medium and light jobs identified by the vocational expert, is supported by substantial evidence. Substantial evidence is defined as more than a scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).[4] Courts are precluded, however, from "deciding the facts anew or re-weighing the evidence." *Davison v. Astrue*, 370 Fed.

---

[4]    This Court's review of the Commissioner's application of legal principles, however, is plenary. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

Appx. 995, 996 (11th Cir. Apr. 1, 2010) (per curiam) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).  And, "'[e]ven if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is supported by substantial evidence.'"  *Id.* (quoting *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158-1159 (11th Cir. 2004)).

On appeal to this Court, Morrow asserts three reasons why the Commissioner's decision to deny him benefits is in error (*i.e.,* not supported by substantial evidence): (1) the ALJ erred in failing to assign controlling weight to the opinion of the treating physician, Dr. Earnest Hudson; (2) the ALJ erred in acting as both judge and physician by arbitrarily submitting her own medical opinion for the opinion of a medical professional in violation of *Marbury v. Sullivan* and SSR 96-8p in finding he can perform a range of medium work; and (3) the ALJ erred, in violation of 20 C.F.R. § 404.1560(c), in failing to provide evidence demonstrating the existence of other work in significant numbers in the national economy plaintiff can perform given the assigned residual functional capacity. The Court will address each issue in turn.

A.    **Opinion of Plaintiff's Treating Physician, Dr. Earnest Hudson**.  On May 30, 2013, Dr. Hudson completed a mental medical source statement[5] and thereon indicated that he had been treating plaintiff every six months since May 16, 2012.[6] On the first page of the form, Hudson indicated that plaintiff's post-traumatic stress disorder (PTSD) was being treated with medications, with some improvement of symptoms, and that the clinical findings demonstrating the severity of Morrow's mental

---

[5]    Plaintiff's then attorneys, Taylor, Warren & Weidner, P.A., supplied this form to Hudson. (*See* Tr. 397.)

[6]    Therefore, Hudson had seen Morrow a total of three times before completing the mental medical source statement. (*Compare id.* at 397 *with* Tr. 320-323, 337-340 & 483-485.)

impairment and symptoms consisted of "some depressed mood, [and] restricted affect[.]" (Tr. 397.) And although Dr. Hudson appears to suggest that Morrow's PTSD is moderate, with a current GAF score of 60 (the highest GAF in the past year also being 60), he goes on to describe several signs and symptoms that are nowhere else contained in the record (*see* Tr. 398), severe to extreme limitations in plaintiff's mental abilities and aptitudes to perform unskilled work (Tr. 399), and even comments that Morrow's impairments and treatment would cause him to be absent from work more than four times per month (Tr. 401).

The law in this Circuit is clear that an ALJ "'must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error.'" *Nyberg v. Commissioner of Social Security,* 179 Fed.Appx. 589, 590-591 (11th Cir. May 2, 2006) (unpublished), quoting *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986) (other citations omitted). In other words, "the ALJ must give the opinion of the treating physician 'substantial or considerable weight unless "good cause" is shown to the contrary.'" *Williams v. Astrue,* 2014 WL 185258, *6 (N.D. Ala. Jan. 15, 2014), quoting *Phillips, supra,* 357 F.3d at 1240 (other citation omitted); *see Nyberg, supra,* 179 Fed.Appx. at 591 (citing to same language from *Crawford v. Commissioner of Social Security,* 363 F.3d 1155, 1159 (11th Cir. 2004)).

> Good cause is shown when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart,* 357 F.3d 1232, 1241 (11th Cir. 2004). Where the ALJ articulate[s] specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. *Moore* [*v. Barnhart*], 405 F.3d [1208,] 1212 [(11th Cir. 2005)].

*Gilabert v. Commissioner of Social Sec.,* 396 Fed.Appx. 652, 655 (11th Cir. Sept. 21, 2010) (per curiam).

In this case, the ALJ accorded "little" weight to the opinion(s) offered by Dr. Hudson. (Tr. 28.)

> [I]t is not consistent with examination findings wherein the claimant's concentration and memory were not impaired, the claimant's abilities to perform simple math and problem solving tests, the claimant's GAF scores of 55 and 60 rather than one indicating serious symptoms, limited need for inpatient hospitalization, and the lack of consistent, formal, and aggressive mental health treatment, such as on-going counseling. Moreover, the undersigned notes that Dr. Hudson is not a mental health specialist. Thus, his opinion is given little weight.

(*Id.*)

This Court agrees with the ALJ that Hudson's various opinions cannot be "squared" with, for instance, the evidence in his VA examination records establishing an intact memory (Tr. 226) or no observable memory, concentration or attention problems (Tr. 268; *but cf.* Tr. 398 (Hudson indicated plaintiff had a memory impairment—either short, intermediate or long term))[7] or with the record GAF scores of 55 and 60 (*compare* Tr. 399 (indicating severe/serious limitations up to extreme limitations with respect to numerous mental abilities and aptitudes necessary to perform unskilled work, including completing a normal workday and workweek without interruptions from psychologically based symptoms) *with* Tr. 271 (GAF of 55 on January 23, 2012), Tr. 363 (GAF score of 60 on February 16, 2012) & Tr. 397 (GAF score of 60 on May 30, 2013, and indication that the highest GAF score in the past year was a

---

[7]     In addition, Dr. Hudson's opinion that plaintiff has "[o]ddities of thought, perception, speech or behavior" (Tr. 398) is completely contradicted by his clinical findings that Morrow's speech was of normal volume, rate and rhythm; his thoughts were structured and goal-directed; and his insight and judgment were both good (Tr. 322, 339, 434 & 485). *See Gilabert, supra,* 396 Fed.Appx. at 655 (good cause exists for not affording a treating physician's opinion substantial or considerable weight where the treating physician's opinion is inconsistent with his own medical records).

60)[8]). *See Gilabert, supra,* 396 Fed.Appx. at 655 (good cause for rejecting treating physician's opinion includes that the opinion is not bolstered by the evidence, the evidence supports a contrary finding, or the opinion is inconsistent with the doctor's own medical records). Indeed, Hudson's specific notation of a 60 GAF and suggestion that plaintiff's PTSD is of moderate severity (*see* Tr. 397) is internally inconsistent with the severe/serious to extreme limitations noted with respect to the mental abilities and aptitudes necessary to perform unskilled work inasmuch as Hudson indicates that plaintiff cannot, in a regular work setting, complete a normal workday and workweek without interruptions from psychologically based symptoms but his GAF score of 60 indicates that plaintiff would have only moderate difficulty in occupational functioning—that is, conflicts with peers or co-workers—not an inability to work or keep a job. *Compare* fn. 8, *supra, with Gilabert, supra,* 396 Fed.Appx. at 655. Finally, this Court agrees with the ALJ that the serious to extreme limitations noted by Hudson— along with the indication that plaintiff would miss more than four days of work a month—would suggest the need for either hospitalizations or intensive psychotherapy or counseling, rather than the rote 6-month return visits to Dr. Hudson for medication checks that pepper the records (*see, e.g.,* Tr. 339, 434 & 485). *Gilabert, supra,* 396 Fed.Appx. at 655 (good cause exists to reject the opinion of a treating physician where

---

[8]      A GAF score falling in the range of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) *or* moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." https://en.wikipedia.org/wiki/Global_Assessment_of_Functioning (last visited, February 22, 2017, at 4:54 p.m.). On the other hand, a GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) *or* any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." *Id.*

the evidence supports a contrary finding).[9] Accordingly, this Court finds that the ALJ properly accorded little weight to the opinions articulated by Dr. Hudson's in his May 30, 2013 mental medical source statement.[10]

**B.       Whether the ALJ Arbitrarily Substituted her Own Medical Opinion for that of a Medical Professional in Violation of _Marbury v. Sullivan_ and SSR 96-8p in Finding Plaintiff can Perform Medium Work.**  Plaintiff contends that the ALJ erred in acting as both judge and physician by substituting her own medical opinion for the opinion of medical professionals to find that plaintiff can perform a reduced range of medium work, in violation of _Marbury v. Sullivan_ and SSR 96-8p. (Doc. 9, at 6-10.) Stated somewhat differently, it is plaintiff's position that since the ALJ rejected Dr. Hudson's opinions, which he contends are supported by evidence in the record supplied by Dr. Chad Hagans and the VA's 70% disability rating, and failed to accord appropriate limitations with respect to his right knee impairment, the ALJ "erred in formulating [his] residual functional capacity as it is not supported by substantial evidence, is contrary to [his] treatment records and testimony, and essentially substitutes the Administrative Law Judge's own medical opinion in violation of Social Security Ruling 96-6p and _Marbury v. Sullivan_." (_Id._ at 10.)

Initially, the undersigned notes that in a specially concurring opinion in _Marbury v. Sullivan_, 957 F.2d 837 (11th Cir. 1992), Senior Circuit Judge Frank Johnson emphasized that "[a]n ALJ sitting as a hearing officer abuses his discretion when he

_____

[9]       Interestingly, Dr. Hudson specifically noted on November 22, 2013, that Morrow had spent "0 Minutes" doing supportive psychotherapy. (Tr. 435.)

[10]       Given all of the proper reasons—supported by substantial evidence—identified by the ALJ for affording Dr. Hudson's opinion(s) little weight, the ALJ's misinformed reference to Dr. Hudson as a non-mental-health specialist (Tr. 28) is harmless error.

substitutes his own uninformed medical evaluations for those of a claimant's treating physicians." *Id.* at 840. In support of this conclusion, Judge Johnson directly cited *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988) for the proposition that "'[a]bsent a good showing of cause to the contrary, the opinions of treating physicians must be accorded substantial or considerable weight by the [Commissioner].'" *Id.* In *Marbury*, of course, the ALJ disregarded the medical diagnoses of the plaintiff's psychogenically caused seizures as provided by his doctors, *see id.*; here, however, the ALJ readily accepted the diagnoses that plaintiff claims establish his disability, that is, PTSD, anxiety disorder, depressive disorder, COPD, GERD,  and status-post right knee repair (*compare* Tr. 22 *with* Doc. 9, at 8-10). What the ALJ did not give great weight to was Hudson's May 30, 2013 mental medical source opinions and, as well, did not find plaintiff's right knee impairment as "limiting" as Morrow seems to suggest; however, the ALJ's findings in these two respects do not amount to an uninformed medical opinion/diagnosis but, instead, simply impact the dispositive issue reserved to the Commissioner. Accordingly, *Marbury v. Sullivan, supra*, does not control disposition of this matter.

This Court has consistently recognized that in order to find the ALJ's RFC assessment supported by substantial evidence, it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician. *See, e.g., Packer v. Astrue*, 2013 WL 593497, *3 (S.D. Ala. Feb. 14, 2013) ("[N]umerous court have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician."), *aff'd*, 542 Fed.Appx. 890 (11th Cir. Oct. 29, 2013); *McMillian v. Astrue*, 2012 WL 1565624, *4 n.5 (S.D. Ala. May 1, 2012) (noting that decisions of this Court "in which a matter is remanded to the Commissioner because the ALJ's RFC determination was not supported by substantial and tangible evidence still accurately reflect the view of this Court, but not to the extent

that such decisions are interpreted to require that substantial and tangible evidence must—in all cases—include an RFC or PCE from a physician" (internal punctuation altered and citation omitted)). Therefore, any suggestion by plaintiff that the ALJ's rejection of Dr. Hudson's May 30, 2013 mental medical source opinion(s) somehow "divests" the record of substantial support for the RFC determination is simply incorrect. Indeed, here, the ALJ's RFC assessment, *compare* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level . . ., the administrative law judge . . . is responsible for assessing your residual functional capacity.") *with, e.g.*, *Packer v. Commissioner, Social Security Admin.*, 542 Fed. Appx. 890, 891-892 (11th Cir. Oct. 29, 2013) (per curiam) ("An RFC determination is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. There is no rigid requirement that the ALJ specifically refer to every piece of evidence, so long as the ALJ's decision is not a broad rejection, i.e., where the ALJ does not provide enough reasoning for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole." (internal citation omitted)), is both "linked to" and supported by substantial evidence in the record, namely, the examination records supplied by Dr. Hudson (*see* Tr. 320-323, 337-340, 432-435 & 483-485), other relevant "mental" medical evidence (Tr. 91-93 (mental residual functional capacity assessment by non-examiner, Dr. Linda Duke); Tr. 266-271 (Dr. Chad L. Hagans' January 23, 2012 Compensation and Pension Examination Report, reflecting, among other things, a GAF score of 55 and a PCL-M score of 66, indicative of mild to moderate PTSD); & Tr. 472-478 (Dr. Linda S. Lindman's July 12, 2013 Mental Health Compensation and Pension Examination consult wherein the consulting psychologist opined that nothing arose in the examination to suggest that plaintiff's symptoms of PTSD "would preclude him from obtaining and maintaining gainful employment[]" and that his symptoms would

likely "improve significantly if he availed himself of therapy specifically designed to treat PTSD and available at the V.A.")), medical evidence of record directed to plaintiff's physical impairments,[11] particularly his right knee (*see* Tr. 226-229, 272, 275, 281, 284, 326-327, 329, 386-389, 424, 427, 437-441 & 452-453),[12] and plaintiff's various

---

[11]     Morrow's COPD and GERD impairments do not create greater limitations than those specifically determined by the ALJ. (*Compare* Tr. 25 & 27 *with, e.g.,* Tr. 226, 279-280, 286, 333-334, 341, 343, 345, 422-424 & 442.)

[12]     While there can be no question but that Morrow had several menisci tears in his right knee (Tr. 386-389) that were arthroscopically repaired on or about February 27, 2012 (*see, e.g.,* Tr. 355), after the surgery the record reflects no continuing problems with the right knee, including pain (Tr. 227-229 (as part of a compensation and pension examination report conducted on November 20, 2012 by Dr. Emily C. Villorante regarding several physical impairments, the examination findings do not reflect any significant limitations attributable to plaintiff's right knee and, indeed, Dr. Villorante found no functional limitations attributable to plaintiff's right knee, etc.); Tr. 272 & 275 (physical examination by Dr. James E. Fay on April 29, 2013 revealed grossly intact range of motion of the extremities, no edema, etc. and, on that same date, the notes of the examining nurse reflect that plaintiff reported no pain and that he walked frequently, that he had no limitations with mobility, making major and frequent changes in position without assistance, etc.); Tr. 281 & 284 (examination on February 11, 2013 by John T. Molyneaux revealed no distal pedal edema or deformity and that the DTR's in the patellar tendons were symmetrical and the nurse's notes from that same date reflect that Morrow ambulated with a steady gait without assistance and reported that he was not in any pain); Tr. 326-327 & 329 (examination on September 5, 2012, revealed no distal pedal edema or deformity and that the DTR's in the patellar tendons were symmetrical and the nurse's notes from that same date reflect that Morrow ambulated with a steady gait without assistance and reported that he was not in any pain); Tr. 424 & 427 (May 9, 2014 examination by Dr. Robert D. Menzies revealed no cyanosis, clubbing or edema of the extremities and, on that same date, the notes of the examining nurse reflect that plaintiff reported no pain and that he walked frequently, that he had no limitations with mobility, making major and frequent changes in position without assistance, etc.); Tr. 437-441 (on five different dates in 2013, Morrow reported that he was in no pain or only mild pain); Tr. 452-453 (examination of the extremities on September 16, 2013, revealed no distal pedal edema or deformity and that the DTR's in the patellar tendons were symmetrical)). In addition to the foregoing evidence, which does not indicate that plaintiff would have any problems in engaging in medium work activity, plaintiff specifically testified that gets around "[f]airly well[]" (Tr. 76) and reported on May 1, 2013 that his lifting is limited to 50 pounds (Tr. 170). When all of this evidence is considered, in combination, it is clear that the ALJ's RFC finding of a reduced range of medium work, limited in part by the ability to only occasionally push and/or pull leg controls on the right, occasionally stoop, kneel, crouch, crawl, balance, and climb ramps and stairs, and complete inability to climb ladders, ropes or scaffolds or work around or at unprotected heights, etc., is supported by substantial evidence. In particular, as specifically noted by the ALJ, "[t]he limitation to occasional pushing and/or pulling with leg controls on the right accommodates" plaintiff's right knee impairment as do the "preclusion of working around or at unprotected heights, operating automotive equipment, or climbing ladders, ropes, or scaffolds." (Tr. 27.) The ALJ is correct in her assessment in this regard.

descriptions of his daily activities (*see, e.g.*, Tr. 165-170 (plaintiff reported he reads books and watches movies or television every day, vacuums once a day for 10-15 minutes, can go out alone, can drive a car, shops by computer, visits his parents a few times a week and spends time at their home) & Tr. 361 (on February 16, 2012, Morrow reported that he enjoyed fishing and "'clean cars.'")). Therefore, plaintiff's second assignment of error has no merit.

    **C.    The ALJ's Fifth Step Determination.**  Plaintiff's final contention is that the ALJ failed to provide evidence demonstrating the existence of other work in significant numbers in the national economy that he can perform given the assigned residual functional capacity. (Doc. 9, at 10-12.) More specifically, plaintiff contends that the ALJ's residual functional capacity assessment, as it relates to only occasional changes in the work setting or routine, no more than 5 minutes of concentrated exposure to fumes, odors, etc., no contact with the public and only occasional contact with supervisors and co-workers, and no production-paced work (Tr.25), actually precludes the performance of the three jobs identified by the vocational expert (that is, hand packager, laundry worker I, and food preparer[13]), and, therefore, because the VE's testimony conflicts with the Dictionary of Occupational Titles ("DOT"), the fifth-step determination is not supported by substantial evidence.

        According to the DOT, work as a hand packager involved frequent extreme heat and performing work according to set procedures, sequence, or pace. The DOT also states that work as a laundry worker I involves a variety of duties, often changing. Instead of food preparer, the DOT classifies DOT #311.674-014 as raw shellfish preparer, which requires occasional extreme cold, serving customers at a bar, dealing with people beyond giving and receiving instructions, and performing work according

---

[13]    These three jobs were identified by the VE in response to the ALJ's hypothetical question concerning a claimant with the same impairments and limitations as Morrow (*compare* Tr. 77-80 *with* Tr. 25).

to set procedures, sequence, or pace. . . . Because the Plaintiff was limited to jobs with less than five minutes of exposure to temperature extremes, no contact with the public, only occasional contact with co-workers or supervisors, only occasional changes in the work setting or routine, and no production paced work, he could not perform any of these three jobs [identified by the VE].

(Doc. 9, at 11 & 12.)

The Court disagrees with plaintiff's fifth-step assignment of error, in part, because the ALJ asked the VE if her testimony was consistent with the DOT whereupon the VE replied that her testimony was consistent with the DOT and, during the administrative hearing, Morrow did not supply evidence controverting the VE's testimony nor did he object to that testimony (Tr. 77-82). *See Leigh v. Commissioner of Social Security,* 496 Fed.Appx. 973, 975 (11th Cir. Nov. 14, 2012) ("The ALJ asked the VE if there were any inconsistencies between his opinion and the DOT, and the VE responded that there were not. Further, Leigh did not offer any evidence controverting the VE's opinion, nor did she object to the opinion.") More importantly, even if this Court assumes that there were inconsistencies between the VE's testimony and the DOT, this Court would find no reversible error because VE testimony "trumps" the DOT; therefore, the ALJ did not err in relying on the VE's testimony to determine that Morrow was not disabled. *Compare Leigh, supra,* 496 Fed.Appx. at 875 ("Even assuming that there was an inconsistency between the VE's opinion and the DOT, the ALJ did not err in relying on the VE's opinion to determine that Leigh was not disabled.") *with Jones v. Commissioner of Social Security,* 423 Fed.Appx. 936, 939 (11th Cir. Apr. 19, 2011) ("In this Circuit, a VE's testimony trumps the DOT to the extent the two are inconsistent. *See Jones* [*v. Apfel*], 190 F.3d [1224,] 1229-30 [(11th Cir. 1999)]. The VE opined that the ALJ's hypothetical person could perform these three jobs. The ALJ was permitted to base his findings about these three jobs exclusively on the VE's testimony, irrespective of any

inconsistency with the DOT, and was not required to seek further explanation.") and *Miller v. Commissioner of Social Security,* 246 Fed.Appx. 660, 662 (11th Cir. Aug. 31, 2007) ("Even assuming that an inconsistency existed between the testimony of the vocational expert and the DOT, the ALJ did not err when, without first resolving the alleged conflict, he relied on the testimony of the vocational expert. Our precedent establishes that the testimony of a vocational expert 'trumps' an inconsistent provision of the DOT in this Circuit."). Accordingly, the ALJ's fifth-step denial of benefits is supported by substantial evidence and is due to be affirmed.

<u>CONCLUSION</u>

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 14th day of March, 2017.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**